## Topham's Petition

*T. A. Sampson*, for claimant.
*Martin E. Cusick*, for township.

ROWLEY, P. J., April 1, 1946.—This matter is before the court upon a rule to show cause why the order appointing viewers should not be vacated.

On March 17, 1941, E. G. Topham presented his petition for viewers to assess the value of certain gravel appropriated for road construction by Jackson Township. The court appointed viewers. Thereafter, the township moved to vacate the appointment, averring, in substance, that the claim is unlawful because George A. Foster, a township supervisor, was the real owner of the gravel, contrary to section 520 of The

Second Class Township Law of May 1, 1933, P. L. 103, 53 PS §19093-520, which declares:

"It is unlawful for any township supervisor, superintendent, or roadmaster to be interested, directly or indirectly, in any purchase made or contract relating to roads and bridges, except as provided for in this Act, or to furnish any materials therefor. Any such person knowingly violating the provisions of this section shall be guilty of a misdemeanor."

The petition for viewers avers that Topham acquired title to the gravel by virtue of the following writing:

"Jackson Center, Pa.
September 10, 1930

"Memorandum of agreement made this date between Geo. A. Foster of Jackson Center, Pa., and E. G. Topham of West View, Pa.

"Said Geo. A. Foster agrees to lease to E. G. Topham gravel pit on his farm in Jackson township with privilege to remove gravel for sale or any use he may wish to make of gravel, together with all the usual rights to roadways, etc., for a period of fifteen years from date for the sum of two hundred (200.00) dollars yearly. Receipt of 200.00 hereby acknowledged. Foster reserves 5000 yards of this gravel to dispose of as he wishes at any time during the life of this agreement.

(Signed)   Geo. A. Foster
              E. G. Topham."

Topham's petition recited that the supervisors entered his gravel pit and carried away sand and gravel, for the repair of township roads, in the following quantities:

"During the year 1936 about 4200 cubic yards
During the year 1937 about 3200 cubic yards
During the years 1938 and 1939 about 7500 cubic yards
Making a total of about 14,900 cubic yards."

Topham avers that the materials so appropriated were reasonably worth $.10 per cubic yard. The petition acknowledges receipt of $451.60 to apply to the account.

Topham further avers that the supervisors of the township did not consult him nor obtain his consent before taking the material.

The petition for viewers is based upon the Act of 1933, P. L. 103, which provides,

Sec. 1150: "When road material cannot be conveniently obtained by contract at reasonable prices, the supervisors of townships may enter upon any land or enclosure within their township lying near the road, and dig, gather, and carry upon the road any stones, sand, gravel or other road material which they think necessary to make, maintain or repair the road."

Sec. 1151: "Whenever the supervisors and the owners of any such materials cannot agree upon the price to be paid therefor, the value of such materials shall be assessed by viewers to be appointed and to make report as provided in this Act in the case of eminent domain proceedings."

(The Act of 1933, supra, sec. 1020, directs the court to appoint three viewers from the board of viewers of the county, upon a claim accruing from the exercise of the right of eminent domain).

The general contention of the township is that George A. Foster, upon whose land the gravel pit was located, was the owner of the gravel and that the alleged lease between Topham and Foster was but a stalking horse prepared to enable Foster to evade the law (supra), which prohibited him from furnishing any materials for roads.

To support this charge of bad faith on the part of Foster, the township offered evidence which it contends establishes the following circumstances:

On April 18, 1928, Foster resigned as supervisor in order to qualify himself to supply his gravel to the

township. Thereafter, gravel was supplied by him. Early in September of 1930 the board of supervisors by resolution proposed to buy gravel from Foster during the next four years at $.10 per yard. Foster was present at the meeting and accepted the proposal. Thereafter, at the same meeting, the supervisors tendered Foster a place on the board to supply a vacancy in its membership. Foster accepted the appointment and returned to the board October 3, 1930. The alleged lease between Foster and Topham is dated September 10, 1930. Topham resides in Allegheny County. Mrs. Foster and Mrs. Topham are cousins. The township took gravel from the pit on the Foster farm, from time to time, beginning in 1930 or 1931 and continuing until 1939. During the years 1934 and 1938 township checks for gravel were paid to Topham. On April 29, 1938, Foster obtained the signature of J. W. Patterson, president of the board of supervisors, to a blank check for gravel which Foster represented was to be applied in payment of Foster's taxes. Foster, thereafter, made the check payable to Topham in the amount of $165.30. Foster obtained the signature of Patterson to a blank check dated August 22, 1939, which he represented was to be applied to the payment of a township note and an insurance premium. Foster, thereafter, drew the check payable to Topham in the amount of $451.60. During the period herein involved Foster demanded 10¢ per yard for the gravel, which was 3¢ more than the WPA schedule. The board agreed to pay Foster $.10. Foster asked the board to pay him for the gravel, now in question, so that he might pay his taxes. Patterson, president of the board of supervisors, never heard of Topham until 1938 or 1939. The township auditors surcharged the check of August 22, 1939, for $451.60, payable to Topham. Foster refused to exhibit to the township auditors his lease with Topham, saying that was his personal business. During the same period, gravel from the pit was supplied to the

State Highway Department at $.07 per yard. Gravel was available to the township at $.05 per yard. In his financial statements filed with his bank, Foster showed the amounts due from the township for gravel taken from his pit as accounts receivable by Foster. Gravel was taken over a period from 1930 to 1939. Topham, the alleged lessee, never obtained a statement of the amount taken and never made an examination nor investigation to determine the amount taken. During the continuance of this road construction as a WPA project, the timekeeper prepared a report which contained the name of the employe or lessor to whom payment was to be made. Upon several of these reports, Foster is named as employe or lessor. In at least one instance, January 3, 1937, Foster had signed his name as employe or lessor.

To support the good faith of the Foster-Topham lease, petitioner undertook to prove that Topham had sold gravel to Pennsylvania Highway Department, J. C. Rau, county superintendent for this department, testified that his office contained records showing purchases of gravel from Topham. The witness produced four purchase orders directed to Topham during the years 1932, 1933, 1934, and 1935. Subsequent examination of this witness developed that the negotiations concerning gravel from the pit in question were carried on by the witness with Foster only. On one occasion, Foster submitted to Topham a highway contract in blank which the latter signed in blank. The witness Rau testified that he learned from the records of his office that Topham had a lease upon the Foster pit. (The witness was directed by the court to produce at the next hearing the records that led him to believe that Topham had a lease. The witness appeared at a subsequent hearing and admitted that he had no such record).

The witness, Rau also testified that there were pending negotiations (several years after the instant pro-

ceeding was instituted), between the Highway Department and Topham regarding gravel from the Foster pit. Upon cross examination, Rau stated that such negotiations as were had by him were with Foster. He stated that he had had no negotiations with Topham, and had not met him until the date of the testimony.

(The testimony of this witness illustrates the harm of permitting a witness to state conclusions instead of limiting the witness to the facts, from which a court or jury may draw the conclusions).

In explanation of the items of accounts receivable set out in his financial statements, Foster states that these items consisted principally of the rents to accrue on the lease with Topham, not accounts payable by the township for gravel.

The township points out that the financial statement of December 1937 shows the amount $700, whereas the rent to accrue as of that date was $1,600, and that the statement of March 1939, two years later, shows the item at $1,500. In the statement of February 1940 the item is reduced to $800. It is the contention of the township that Foster had credited this item with the check of August 22, 1939, for $451.60, drawn payable to Topham.

The statements of February 1940, January 1941 and February 1942, each show $800 as accounts due Foster for gravel. Both Foster and Topham testified that the rent was paid each year.

We quote from Topham's brief:

"The supervisors now attack the appointment of the viewers, contending that the lease of September 10, 1930, was a fraudulent arrangement to evade the provisions of the act of assembly.

"In answer we say that what the act of assembly forbids is that a supervisor be interested in a *purchase* by the township. The word 'contract' as used in the act of assembly involved means a written contract after advertisement and bids. Here there was no such thing.

"Moreover, as to any fraud, the township has not been hurt nor can it be hurt. At present it has received about 12,000 to 14,000 cubic yards of material for which it has not paid. The township is not being asked to pay for anything it has not received. To us it seems strange that the township would wish to receive road material from an individual and not pay for it."

If the foregoing is intended to suggest that a municipal officer forbidden to be interested in a purchase or contract, may nevertheless circumvent the statute by resort to eminent domain, we unqualifiedly disagree. Such an interpretation of the statute is unthinkable. Ever since the Act of April 26, 1855, P. L. 328, it has been a crime for a municipal officer to be interested directly or indirectly in furnishing supplies to that municipality. This prohibition was specifically directed to township supervisors by the Act of May 1, 1933, P. L. 103, 53 PS §19093-520. In discussing the Criminal Code of March 30, 1860, P. L. 382, sec. 66, the third clause of which contains substantially the same prohibition as the last cited statute, the Supreme Court said:

"They embrace breaches of various trust relations which were at least per se offenses against good morals, and the evident legislative purpose was to make them also criminal offenses." Com. v. DeCamp, 177 Pa. 112, 114.

" 'The object which the legislature had in view was the prevention of the danger of temptation, incident to a relation in which the self-interest of the officer of the corporation or municipality purchasing the supplies may come into conflict with the interest of the corporation or municipalities': . . . 'No man can serve two masters. He that is intrusted with the interests of others cannot be allowed to make the business an object of interest to himself, because, from a frailty of nature, one who has the power will be too readily seized with the inclination to use the opportunity for

serving his own interest at the expense of those for whom he is intrusted. The danger of temptation from the facility and advantage of doing wrong which a particular situation affords, does, out of the mere necessity, work a disqualification' ": Commonwealth v. Witman, 217 Pa. 411, 414.

The prime question in the instant case is whether the appropriation of the material was tainted by fraudulent conduct on the part of Foster. If the Foster-Topham lease was merely a device to conceal Foster as the real owner of the gravel, then neither Topham nor Foster has a claim that the law will recognize either in assumpsit or on a view.

If, however, Topham had honest title to the material taken, the question might arise whether he must proceed in assumpsit because the supervisors are empowered to enter and appropriate only when material cannot be conveniently obtained by contract at reasonable prices. There is also involved the question what formal action by the board of supervisors must precede an entry. Acceptance by Topham of the checks after Foster had informed him that the township was paying him $.10 per yard, may also require consideration.

Assuming an unimpeached lease, was Foster's interest as lessor such as to attract the statutory prohibition?

As we have indicated, the principal question is whether the transactions are vitiated by fraud.

Where the facts are disputed, the court is without power to declare fraud. In this proceeding, the court may not find facts nor determine the inferences to be drawn from such facts.

"The fact that the question here involved was one of fraud, is an additional reason why the court should not have given binding instructions. 'Fraud in fact is always a question for the jury, and however convincing may be the evidence on the subject, it would

be to confound the province of the two tribunals for the court to assume the decision of it.' Loucheim v. Henszey, 77 Pa. 305": Fry v. National Glass Co., 219 Pa. 514, 520.

We think it is beside the point to say "the township has not been hurt".

"The common law not only gives no definition of fraud, but perhaps wisely asserts as a principle that there shall be no definition of it, for, as it is the very nature and essence of fraud to elude all laws in fact, without appearing to break them in form, a technical definition of fraud, making everything come within the scope of its words before the law could deal with it as such, would be in effect telling to the crafty precisely how to avoid the grasp of the law. . . .

"What will constitute fraud by any kind of deceit, whether by means of concealment, reticence concerning matters of which the party should speak, false representations, or artifices of any kind, must always be determined by the particular circumstances. The criterion is the good sense of the jury, estimating the character of the transaction by applying to the evidence their general knowledge of human motives, and their sense of dealing. Fraud is manifold in its devices, and its ingredients cannot be so defined as to include all cases, save by such general statements as must, after all, refer the question to the judgment of the jury upon the facts.": 20 Cyc. 10, note 22.

Moreover, there is evidence that gravel was available at $.05 per yard, and that gravel from the Foster pit was supplied to the State Highway Department at $.07, and that the WPA found $.07 to be the current price.

Whether procedure by eminent domain is appropriate need not be determined at this point; nevertheless, we feel constrained to comment upon the declaration of claimant's brief that "the law provides two

methods by which supervisors may obtain material for roads". The statement is correct in a limited sense. However, it is not correct to assume that supervisors are free to elect either method. Materials must be obtained by contract where that is possible.

Only "When road material cannot be conveniently obtained by contract at reasonable prices" are supervisors empowered to proceed by eminent domain.

The petition for viewers avers that it was inconvenient to obtain road material by contracts "owing to the number of transactions, the necessity of advertising, taking bids and obtaining written agreements."

Obviously, the requirements of law cannot be regarded as an inconvenience, excusing procedure by contract.

An entry upon land in exercise of eminent domain is a demonstration of the superior power of the State over the private property of the individual citizen. The right to exercise the power and to delegate it, is an attribute of sovereignty. This power is a bit anomalous under a free government but it exists ex necessitate, consequently it is not to be lightly exercised nor lightly delegated. Where the power is delegated to a municipality all statutory limitations and directions for its use must be strictly pursued.

A board of supervisors must act as a body. The act of an individual supervisor is not necessarily the act of the township.

Obviously, an owner may resist an unauthorized entry under a claim of eminent domain but where, as here, claimant condones the entry, the regularity of the proceeding may become merely academic.

For the reasons stated, we do not undertake to determine now the title to the property appropriated. Claimant must establish ownership of the gravel to the satisfaction of the viewers. From the conclusion of the viewers, either party to the proceeding may appeal. If claimant fails to ultimately establish own-

ership of the material, his claim falls, and the regularity of the proceeding is of no moment. Otherwise, the township may challenge the form of procedure adopted by claimant.

## Order

And now, April 1, 1946, it is ordered, adjudged and decreed that the rule to revoke the appointment of viewers be discharged without prejudice to the right of either party upon appeal from the report of viewers to renew any question presented in the argument upon the instant rule.

NOTE.—Exceptions to the foregoing order were filed but not pressed.